The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. Welcome all of you to the Fourth Circuit Court of Appeals today. We're pleased to have you here. We've got four interesting cases. In our first case, Covington v. MCIC, number 142055, Mr. Goldman. Be pleased to hear from you, sir. Thank you. May it please the Court. Together with my partner, Robert Skeen, I represent the Garns family, a wrongful death case for their surviving children, and a, what is known as a survival action up in Maryland, for the conscious pain and suffering of Mr. Garns. I think I ought to get right to the issue of product, asbestos product exposure, because Mr. Garns died of asbestos lung cancer, to which no doubt smoking contributed. That's, that's known. Recalculate that he had five years, according to the Social Security printout, of exposure in various shipyards in the Baltimore area. But the thing that we say quenches this case is the findings of Judge Lawrence Rudowsky in the Albus Knuckles case. And the reason we say it's a powerful set of facts for our case is that Judge Rudowsky found that the conditions, as he recited in Albus, at Fairfield Shipyard, were enough to incriminate the defendant asbestos companies who contributed to the mass of asbestos fibers in Fairfield. It's noteworthy. Do you think, over here. Certainly. Do you think that controls us and we have to make that same finding? Do I think that that controls you in what? As to the finding of liability of these defendants as to your clients. Well, it fits like a glove as far as the exposure is concerned. And certainly at the summary judgment stage, it's powerful evidence to be considered by the trial judge when he's really on a motion for summary judgment by these defendants. But he was ruling as to a different set of facts. Not as to the particular facts of your client. Don't you have to show some sort of causation? I'll get to that. There's no question. But the stellar holding in Balbos was that there was no frequency, regularity, or proximity proved of Lestew Balbos to the products of any manufacturer or to any insulation activities. And the good thing, from our standpoint, we think it's, at least at the summary judgment stage, it's provative that Celotex Carey was one of the individuals that was caught in Judge Radowski's findings. And Celotex Carey was, well, put it the other way around. McCormick, a specialist, was the agent for Celotex, the Hales agent for Celotex Carey. So if you get Celotex Carey, you get McCormick. And McCormick is one of the defendants in this case. I have a question for you. Certainly. I want you to take effective use of your time for me. Other judges have other questions. As for me right now, I want you to assume, for my purposes, that the law in Maryland is frequency, regularity, and proximity. You don't agree with that, but I want you to assume that. And now tell me as to which or each of these defendants, which is your strongest case of your factual evidence in this record? McCormick.  McCormick was a sales agent for Carey Celotex. And Carey Celotex was one of the companies that contributed to the asbestos cloud at Fairfield. That's why. And so your evidence is because there was one person who was a salesman that links McCormick? No, it's not. The record is clear that Celotex, Celotex Carey products were regularly brought to Fairfield Shipyard. Is the evidence that that's the only type of asbestos that was brought there? No, there were others, of course. How do you link your claim to McCormick then? McCormick was a substantial factor in the test cloud at Fairfield at the same time that Covington, at the same time that Melville and Garns both worked there. Now, in addition, Garns worked at Key Highway and spoke of being around boilers being insulated, lots of dust. And the witness, Groschan, says that he was an insulator at McCormick and that's what he did at Key Highway at the Fairfield when Garns was there. So that, in my opinion, buttresses the case against MCIC because Groschan was an insulator for McCormick. Now, the other thing to talk about direct evidence, Your Honor, the other direct evidence is Garns' work. Let me be clear. I didn't limit my question to direct evidence. I think you get the benefit of circumstantial evidence, too, so it's not just direct evidence. But I'm glad to hear your strongest evidence. You said it's against McCormick, and I'll just give you the chance to put that evidence from the record in front of you. All right. McCormick insulated the Patrick Henry. Groschan testified to that. Not only was Garns on the Patrick Henry, but when the Patrick Henry was scrapped, Garns tells us that he helped scrap it. The white stuff had to be knocked off the pipes, and the white stuff, of course, is asbestos. So he got a snootful of McCormick asbestos that had been put on the ships, on the Patrick Henry and Fairfield. What is the site for that in the record, that Garns worked on that insulation on the Patrick Henry? What is the JA site for that? Because your brief says it's JA 497, and JA 497 does not say that. Okay. I stand corrected. I can only say that he said he worked on the Patrick Henry around the boilers and other machinery that was insulated by McCormick. And that's how we get that nexus. Who is he? He said that. Garns. Garns said he worked there. Garns testified he worked around the Patrick Henry, including boilers, and Groschan says... How long did he say he worked there? Well, it's... Less than a week, maybe? No, no. We've got... I don't have a Social Security printout. I think it's about... I think it's about... Well, I don't want to guess. I can only tell you that the Social Security printout shows that all told, he had five years of exposure to asbestos products. All of them we maintain constituted a substantial factor in five and a quarter. We say that constitutes a substantial factor, and I want to say one thing about substantial factor. Just let me say about substantial factor, you have to have the evidence, at least from my question, to show that your client was there on a regular, he was approximate basis, and he was on a frequent basis. That's what you have to show. If you accept the law, as I asked you to for my question, and I'm asking you where's your specific evidence. The Social Security record doesn't indicate that your client worked on the Patrick Henry. It doesn't say that, does it? No. It's only his oral testimony. In his oral testimony, did he testify that he worked on the Patrick Henry for more than a week? Well, the Social Security says that he was a Fairfield shipyard for more than a week. So that is your link to the Patrick Henry is the Social Security record? And everything he testified to about his work at Fairfield. What did he say about his working around or near the Patrick Henry? He was on the Patrick Henry. For how long? I can't testify to that. What's the record show? The record shows, well, I think the Patrick Henry was in the shipyard for eight months altogether, according to the ship list. But I really would like to press a substantial factor issue, if I may. I know that it's apparent that you're looking for direct evidence only. No, that's not correct at all. That's not correct. Any circumstantial evidence that you have that he was around any one of these defendants' asbestos, circumstantial evidence that your client was around them on a regular, frequent basis, is good evidence. You don't have to have direct evidence, I don't think. Well, I can only… You just need evidence. What? You just need evidence, and circumstantial evidence is good evidence, too. I think we have circumstantial evidence. Well, that's what Judge Shedd's explaining. We aren't confined to direct evidence. We need evidence. Well, certainly the facts shown in the Garrett case, which were adopted by this court, the United States Court of Appeals for the Fourth Circuit, would be sufficient to show the amount of exposure. That's what I'm trying to say. Let me tell you why I'm doing this. I'm trying to get you to put your best case of evidence from the record forward. I want you to make your best case on the evidence, and then I'm going to make the other side answer to it. That's what I plan to do, and see what they say about it. So I'm giving you a chance to show us from the record your best evidence that your client was exposed to the products of the defendants, and then I'm going to ask them in turn to respond. Okay. There's J.A. 2213 and 2234. He testified that he worked in the boiler room and engine room on Liberty Ships at Bethlehem Fairfield. He worked on all 16 ways. There are 16 ways down there. And your Honor should know that Fairfield is the most toxic shipyard around Baltimore, and the reason I say that is that Judge Radowsky found in Balboa's that Balboa's in two years got as big a load of asbestos in his lungs as Knuckles did for at least 10 or 12 years exposure. Your red light came on there. Excuse me? Your red light's on. Listen to Judge Thacker first. What was that? Listen to Judge Thacker. Answer this question right here. Did you say Mr. Garns worked in all 16 ways? Yes. Okay. Well, Mr. Garns testified at J.A. 515. Question, did you work on all 16 of the ways? Answer, I wouldn't say 16. Well, in another place in the record he did say, and this is for a jury or for the judge considering summary judgment, there was another statement where he said flatly, I worked on all 16 ways. You're looking at evidence, you're looking at testimony which is 60 years old. Just let me say one thing that I think is very important. The leading Maryland precedent on substantial factor causation is Shetterly. And Shetterly ignores Lorman except to reverse it. That's what the judge who wrote the opinion did. That's the precedential value of Lorman. You say it's time for rebuttal. Let's hear what Mr. Skeen has to say. Good morning, Your Honors. I'm here only to address the issue of SB Decking Incorporated. Limited to what? SB Decking Incorporated, one of the defendants. I'm limited to that. As far as evidence goes, there was tremendous evidence of the presence of SB Decking products at Bethlehem Steel Fairfield from 1942 to 1947. And that's based on a deposition of Mr. Losalento who was an employee of Selby Battersby Company who worked at Bethlehem Steel Fairfield at the same time Mr. Garns was employed there. Mr. Losalento was employed at Selby Battersby from 1942 to 1944 as an apprentice and then became a mechanic. He sprayed asbestos-containing product known as limpet. Mr. Losalento testified in his deposition that he would usually spray around 1,200 square feet daily. It's a massive amount of spray. What's the JA site to that? 2210, Your Honor. Thank you. Mr. Losalento, in his deposition, he testified that he sprayed SB Decking and Company's, or then known as Selby Battersby's product, limpet, which included boiler rooms and engine rooms. And Mr. Garns did testify that he, as a general laborer at Fairfield, would sweep up in the boiler rooms and the engine rooms. Mr. Losalento further testified that he sprayed about 50 ships at Bethlehem Steel Fairfield from 1942 to 1944. And Mr. Garns said in his deposition that he remembered working on Liberty ships when they were being constructed at the shipyard at the time. Mr. Losalento testified that when he sprayed in the boiler and engine rooms, it encompassed an area anywhere from 10,000 to 15,000 square feet. Then the magnitude of Selby Battersby's extensive spraying of limpet at Bethlehem Steel Fairfield in question is also shown in their response to request for admission number 46, which says that Selby admits that it sprayed limpet on 115 hulls of ships at the rate of 22 hulls a month, starting on or about December 15, 1943. This is a response to request for admission from Selby Battersby, now SB Decking at the time. Do you have any, I'm going to ask you again, do you have any testimony that places Garns specifically near limpet? Not circumstantial, but direct evidence. Garns saying, I don't have any direct evidence, Your Honor. All I can say is that he testified that he worked on Liberty ships during that period of time. So I want to understand, do I understand your argument to be limpet was used a lot, he was there a lot, that makes your, meets your burden of proof? I believe so, Your Honor. I mean, but that is your evidence. That is our evidence, and I mean, there certainly is, I think, tremendous evidence, not only from his deposition, but also from the defendant themselves, that they were there in a tremendous way at that period of time. And if they were spraying that many Liberty ships, and Mr. Garns is working as a laborer on those Liberty ships, I don't think it's a strong connection. It's a hard connection to say that he was there during this massive amount of spraying. Do you think, let me ask this, do you think everybody on the shipyard during that time then was exposed enough for causation? Everybody? Well, I would think anybody, unless they had a constitution of iron, would have probably had certainly a reaction to the amount of asbestos that was in the air. I said that, do you think that anybody who was present on that shipyard, under your theory, then makes out causation? No, no, I'm not saying that. Well, then you distinguish Mr. Garns from anybody else who was there. Because he was on the Liberty ship, Your Honor. He testified to being on the Liberty ships, and Mr. Losalento said that he sprayed over 50 Liberty ships during the period in time. In other words, what I'm saying, this is a much more contained environment than just walking around the shipyard. Is there any evidence of when you spray that limpet, how long it is in the air or is it effective for somebody? In other words, I'm trying to figure out, based on this record, or at least your theory of liability, if somebody is near the ship, what's the evidence in the record to show Mr. Garns and what somebody would have to be near that to be subject to getting asbestosis from it? Pardon me, Your Honor, what did you say? On the ship. On the ships, yeah. All right, that changed my question. Somebody on the ship. I'm asking you, what's your theory and the evidence in the record that supports it? You've established, I'm going to ask the other side about this, it was sprayed heavily on a number of ships at the same time you say Mr. Garns was at that location. You don't have him next to those ships in the record? He may have been, I don't know, but you don't have it in the record that he was next to them or that he was on them on the day they were sprayed or any of that. I'm just asking what you have. I'm giving you a chance to make your very strongest case. I understand what you're saying. The evidence is that he worked on the Liberty ships. There was extensive spraying on the Liberty ships. He says he went on many different Liberty ships while this was going on. What do you say, while this was going on? While the spraying of limpet was going on. You mean during the time frame it was going on? During the time frame, yes, exactly. But he doesn't say he went on a ship as it was being sprayed or while it was being sprayed. No, Your Honor, we don't have evidence to that extent, but it just seems as if the pervasiveness of the product at the time for somebody working on a ship. So your theory is that there was, by your evidence, there was enough work being done at the shipyard that anybody that was near to those ships, that makes the causation? Not near to the ships, Your Honor, on the ships. Okay, anybody on the ships? On the ships, right. On any of the 16 ships at any time during this time period? I wouldn't say any of the ships at all. I'm limiting it to the Liberty boats. To the Liberty boats? Liberty ships, yes, right. Senator? What's that judicial notice motion about? Oh. You all filed a judicial notice motion? Yes, Your Honor. You want to add something to the record that's not in it? Let me see. That's in the Wayne Manufacturing Company. We're asking the court to take judicial notice that Wayne had common officers and directors with Hoffman Brothers, and that therefore the purposeful direction under the Asahi case gives us long-arm jurisdiction in the world. If I have time, I would like to say. Your time's up. You did your part. You get some rebuttal time. And your time's up now also. But you both have some rebuttal time reserved. Thank you, Your Honor. But we're going to hear from the other side. We've got several lawyers on that side. Mr. Mervis, did I pronounce that correctly? That is correct, Judge King. Thank you. Pleased to have you here, sir. Thank you very much. May it please the court, Mr. Mervis, on behalf of the Wallace and Gale Asbestos Settlement Trust, today I will be arguing on behalf of all defendants as to general matters affecting each of the five defendants, and I will also argue specifically as to Wallace and Gale. The plaintiff's challenge in this case is truly remarkable, for they are seeking to reverse one of the most laudable, influential, and seminal decisions this court has ever issued, the Warman v. Pittsburgh Corning decision of 29 years ago. Their attempt to reverse black-letter law, particularly black-letter Maryland law, suffers from numerous flaws. First, this court cannot reverse Maryland law. Eight Court of Appeals of Maryland decisions have adopted and applied the Warman frequency, regularity, and proximity test. This court is going to apply. That's a pretty elementary proposition. We can't reverse Maryland law, is it? It is, Your Honor. You're right on that. We can't reverse our prior panels either. No, Your Honor. Even if that's true, we're not going to admit it. And you shouldn't, because of the second error, which is that Warman is an excellent decision that presciently declared what the law of substantial... Yeah, but Warman, that isn't Maryland law. That's the Fourth Circuit saying what Maryland law is. That is correct. And then courts around the country... But you came right. No matter what you think about Warman, no matter what we think about Warman, Warman it is. That is correct. And Warman is the majority rule. For us. Right. I just want to emphasize that Warman is the majority rule around the country. The only indication that it might not be the majority rule that plaintiffs cite is... Let me ask you this. Yes. Do you have any Maryland law after Warman that indicates that Maryland continues to believe, and the law in Maryland is the regularity, proximity, and frequency? Eight Court of Appeals decisions, highest court in Maryland. Yes. How many? All reported. Most recently the Dixon decision from 2013. There's no question in your mind, is there, that under Maryland law circumstantial evidence may be used? Absolutely. As well as direct evidence. Absolutely. The Balbos case has extensive discussion of circumstantial evidence, as did Warman. So there's nothing unusual about Maryland law. It is in conformity with jurisdictions around the country. It doesn't matter. It doesn't matter if there's anything unusual about Maryland law, does it? No, Your Honor. So the third issue where plaintiffs err is their claim that summary judgment can never be granted on a substantial factor causation case. The first page of their reply brief says that no Maryland Court of Appeals decision has ever affirmed a granted summary judgment. This is absolutely wrong. In 2010, the Reiter v. Numo ABEX decision specifically affirmed the grant of summary judgment on substantial causation. Let me ask this. Does it matter to us that no court in Maryland has ever granted summary judgment on a fact pattern and a law pattern? It shouldn't, Your Honor. What governs our review of summary judgment? The facts of the case do, Your Honor. And federal law? Yes. That is absolutely correct, Your Honor. And under that law, the non-moving party, the other side, would be entitled to all reasonable inferences from the evidence, correct? That is correct. That's why I asked them to put on the record the evidence. So I hope at some point you will turn to that. Maybe you can't do it for each individual defendant. I'll do it for Wallace and Gale, Your Honor, and I'll turn to that in just a minute. I do want to address the plaintiff's argument about inferences and how Maryland law supposedly has a very expansive rule of law regarding inferences. Do we care what Maryland says about reasonable inferences for summary judgment in federal court? Well, they cited the Shetterly case. But I'm asking you. No, no, Your Honor. I mean, you're going to take some time and do it, but don't you think it's a – I don't care. You can take your time now. No. Well, federal summary judgment, we all know what the standard is, and I think I've stated it. Right. It is that the non-moving party is entitled to all reasonable inferences from the facts and then see if there are any disputed material facts. That's absolutely correct, Your Honor. As opposed to this case, what that means is under the frequency, regularity, and proximity test is that the plaintiffs must prove that the decedent or the plaintiff was in the same place at the same time as the exposure to the asbestos product in question. That's the operative test. They have to be there, and the exposure has to be of sufficient quantity to allow for a substantial factor causation determination to be made. You said you wanted to say something about Shetterly because they said it. I don't want to cut you off. If you want to say it, it's your time. No, no, no, Your Honor. I'll briefly address the Shetterly decision. First of all, it did not reverse Lorman in two places. It applies the frequency, regularity, and proximity test. 117 F 3rd 780, and again on page 782, cites and applies the test. So it didn't do that. The amount of exposure in Shetterly, if we're comparing and contrasting,  Shetterly involved two types of exposure. One was an asbestos cloth that the plaintiffs either cut or used all the time in their work. The other was five of the six decedents worked next to Armstrong ACNS contractors that used Raybestos products in question. So there was ample exposure in Shetterly, as there was in all the other cases, including Balboa's. And I just want to address the Balboa's decision for a minute because that is the seminal decision in Maryland. In Balboa's, there is ample exposure, two years of exposure, at Fairfield Shipyards to the specific product Eagle Pitcher Cement that was in the engine rooms. Mr. Balboa's worked in the engine rooms, and he was covered with asbestos with eyewitnesses who said Eagle Pitcher Cement was the product used there. So you had direct testimony at the same time, same place, and a lot of exposure. So Balboa's does not help the plaintiffs. I will now turn, if I may, to the Wallace and Gale issues because I know you want to focus on that. The Wallace and Gale case may be the weakest of all five. There is no evidence whatsoever that... Your argument may be the weakest in Wallace and Gale? No, Your Honor. The Wallace and Gale evidence cited by the plaintiffs, I apologize for being imprecise, the Wallace and Gale evidence may be the weakest of all five because there is no evidence whatsoever that Mr. Garns ever worked in the facility where Wallace and Gale allegedly was present. Plaintiffs allege that Mr. Garns worked at Key Highway Shipyard. That's different from the Fairfield Shipyard. The Key Highway Shipyard where Wallace and Gale allegedly was present. But Mr. Garns never testified to that in his deposition. His complaint never... He never testified to having worked at Key Highway. His complaint never alleged that he worked at Key Highway. His answers to interrogatories didn't mention it. His four claim forms submitted to Wallace and Gale to the Trust for Administrative Processing didn't mention Key Highway. So five times he had an opportunity to mention it, he didn't. And five misses is a lot, Your Honor. I would also add that the only time evidence cited by him comes at Joint Appendix 1701, which is a Social Security printout for Mr. Garns. And what that printout says is not Key Highway. It says Bethlehem Steel Company, 701 East 3rd Street, Bethlehem, Pennsylvania. Well, Bethlehem at the time was one of the largest corporations in the world. They had steel mills and shipyards and plants all over the country. This was the ID number, the tax ID number for general steel operations, not a plant-specific or facility-specific number. So the fact that a general number is used for Mr. Garns doesn't have any probative value as to where he actually was working. In their reply brief, the plaintiffs come back and cite a Social Security printout from another plaintiff in another case, but one George Gers, that has the same ID number, and Mr. Gers did work at Key Highway. And they say, aha, this number must be a Key Highway number. But in fact, they have no proof or evidence that it was a Key Highway number. They raise this for the first time below in their motion for reconsideration reply memo. We never had a chance to disprove it. Had we done it, and I will proffer to the court what we would have proven and would do so if the case were to go back, is that there are other individuals. Wait, wait, wait, wait. Are you trying all first information, not in the record? I'm suggesting that since we've never had a fair chance to reply. I didn't ask you that question. Yes, Your Honor. You're trying to put, you would have us make a decision based on something that's not true? No, Your Honor. I'm simply trying to explain what happens when people present things at the last moment with no chance for a rebuttal. There is no, I will say this, there is no evidence whatsoever that the employment ID number used for Mr. Garns that says Bethlehem Steel, Pennsylvania, is facility-specific to Key Highway. That's pure speculation on the plaintiff's part, and it's one that we hope we could disprove if it ever came to that. The other issues in this case, Your Honor, I think are all very straightforward. The plaintiff's below improperly incorporated by reference summary judgment memoranda that was submitted from other cases, not from this case,  and then finally, Your Honor, they're not pressing now. Their attack on the constitutionality of the denial of a hearing is not worthy of further argument. A denial of a hearing below? Yes. They got a hearing below? They had a record review. Doesn't that qualify as a hearing under the federal rules? It satisfies the federal rules, absolutely, Your Honor. Rule 78B as well as the local rules. A judge, if he reviews papers, that's considered a hearing. You're entitled to a presence to make an oral argument. Do you think you are? I'm not arguing that, Your Honor. I didn't ask you if you were arguing it. I said, do you think you're entitled to that? Absolutely not, Your Honor. There's no entitlement to it. That is correct. It is not a due process violation. No, I didn't ask you what you were arguing. I said, do you think you are? The person is entitled to that. They're not entitled to that. No, Your Honor, no. And I know you say that's been withdrawn anyway. In any event, Your Honor, in closing I would like to say that as to Wallace and Gale, there is no evidence of any exposure to any Wallace and Gale product, and as a result we do not even need to get to the frequency, regularity, and proximity test because there simply is no proof of any contact whatsoever. Thank you very much. Thank you, Mr. Mervis. Mr. Allen? Yes, Your Honor. May it please the Court, my name is David Allen and I'm representing the entity known as Wayne Manufacturing. And good morning. It's an honor to be here. At the close of discovery, or for summary judgment, including the ground that Wayne was not subject to jurisdiction under Maryland law. The Court below granted that motion relying on the case of Lesnick versus Hollingsworth and Bose, which I'll refer to as H&B so I don't get tongue twisted. And Lesnick makes clear that in the Fourth Circuit, in order to establish personal jurisdiction over a non-Maryland entity, it is not sufficient to show that a product made and sold by that entity in a state other than the forum state, place that product in the stream of commerce even where that non-Maryland defendant knows that it's likely that that product is going to end up in Maryland. Instead, the plaintiff has a burden of establishing that the non-resident defendant itself, by actions purposefully directed to Maryland, creates a substantial connection with Maryland or otherwise invokes the benefits and protections of Maryland law. Now, plaintiffs suggest in the reply brief that the Court should apply the stream of commerce rule, but appellant cites no case indicating that this circuit has in any way abandoned the Lesnick rule or any other case that suggests that the Fourth Circuit would rule to the contrary. Now, in terms of the facts, it's, number one, I think it's undisputed first that Wayne had no offices or employees working in Maryland at any time, that Wayne did not advertise or solicit business in Maryland, and further that Wayne was a Virginia corporation, and that from time to time Wayne would laminate panels together that Hopeman would purchase so that they could be used on board in the construction of commercial vessels. Hopeman Brothers, which was the parent corporation, would purchase the panels for manufacturing. Do you care about the motion of a judicial notice? I certainly do, Your Honor. What do you want to say about that? Your Honor, it's clear that in the opposition that was filed before the court below that the issue of whether there was any overlap in the officers or directors of the two corporations was simply not raised to the court below. So you oppose the motion? And I oppose the motion, Your Honor. Where we are is that Plaintiffs waited until, they didn't file it with their original brief so that we could get the facts even before the court in terms of filing our brief. They waited until after their reply had been submitted and then filed this motion. If we grant the motion, does that undermine your position? Otherwise? If you allow the evidence? Yes, if we grant the judicial notice, does that undermine your position? No. So you're saying it doesn't make any difference? In the end, I don't think it does. So you don't care whether we do it or not? Well, Your Honor, I do care because I think it's... You do care. But it doesn't have any material effect on the case. That's correct, Your Honor. But in fairness, I think... It's important to you. Correct. You just don't like how it unfolded. Correct. You think the record is the record? Yes. We have to take the record as it was created in the district court. Yes, Your Honor. And you think that if something else is going to be offered for the record, you at least should have some opportunity to be fairly heard on why the property itself should not be accepted. Correct. And when did they file the complaint against your client? The complaint was filed, I think, in 2009. But I'd have to double-check. So then it was five years later they're filing this after the fact motion for judicial notice to try to get jurisdiction over your client when they should have done it five years ago. Yes. I will say... Now, there is a provision under Rule 10 that you supplement the record on appeal. Is that, in effect, what they're trying to do? Rule 10E, I think. Are they trying to do that? It may well be that they're entitled to ask to supplement it, but they've not given the court below any opportunity to consider... No, but you can supplement the record on appeal under Rule 10E in very limited circumstances. Now, what they're trying to do is judicial notice, I'm not saying. But there is a provision under Rule 10 that you can supplement the record, a party can, on appeal in appropriate circumstances. But anyway, I don't mean to be taking your time. No, no, no problem, Your Honor. I just would point out that, in the end, there is no evidence that was placed before the district court that in any way suggested that Wayne had taken any action to purposely direct itself to Maryland or to seek the benefit of its laws. And Judge Russell was correct in his ruling to prohibit, in his conclusion, that there was no jurisdiction. The only thing that plaintiffs have put before this court is that there is some overlap in the directors and officers of the two corporations. We have cited a series of cases which make clear that that is not a sufficient basis to strip away the corporate form and come to a different conclusion. So even if the court were to look and consider that, it does not provide a basis for a finding of jurisdiction over Wayne in this case. So the only two things that they – the other point that they raise is that Wayne did what it contracted to do, which was laminate the panels. And they suggest that clearing out the contract is somehow an evidence of undue control. And that simply makes no sense. If the plaintiff's position is accepted here, then virtually every corporation that is a subsidiary would provide a basis for jurisdiction. And plaintiff's argument – I'll wrap up. Plaintiff's argument is actually backward because they're using cases where jurisdiction over the subsidiary was used to get jurisdiction over the parent, where here they're trying to use the fact that Holtman clearly admits that it did business in Maryland. Are you wrapping up now? Yes. This is my last statement to go the other way, and the rationale of those cases simply doesn't apply. I thank the court for its time and ask that the ruling below be affirmed. Thank you, Mr. Allen. Thank you, Your Honor. Mr. Locher? Yes, Your Honor. Good to have you here. Good to be here. Let me start by saying that Mr. Goldman and I were here about 30 years ago arguing – You want to start by saying who you represent. I'm sorry. Ward Locher. I'm here for SB Decking, otherwise known as Selby Battersby in the old days. Thank you. Mr. Goldman and I were actually here doing the Lorman case 30 years ago, and I hold him – Well, welcome back. Always good to return. I hold him in the highest respect, and I have great fondness for him. I do think he's wrong today, though. I suspect you think he's wrong every day. Let's dwell on the fondness part. If we want to know where Mr. Garns was exposed, the best evidence for that is asking Mr. Garns. And he gave a 200-plus page deposition in his asbestosis case where he was represented by Mr. Goldman and where they went through every single job on his Social Security printout. By the way, I have it at 772. They went through every job where he was exposed to asbestos. When you look at that transcript, he never said he was at Key Highway. He never mentioned Selby Battersby. He never mentioned being around anybody spreading any decking materials. He never mentioned being around anybody who was spraying any sort of insulation. He showed that he did have a good memory, despite the fact that 60 years had passed. How old was he at the time of the deposition? Oh, geez, I really don't know. I wouldn't know. He was a grown man because he was in the shipyard in 1944. I guess if I could do the math, I'd be a doctor. But he was already working in 1941. Well, the point is this. Good memory, bad memory, honestly, that really doesn't matter. What matters is the evidence and the record. And he doesn't have to rely on his memory. If there are records of other people who had good memories, who can testify. And let's look at the other people who have been proffered as having any evidence in this case. I'm going to save Mr. Losalento for last because there's two things I need to say about him. You're out of time telling us what you're going to say. You better get to saying it. Yes, sir. They rely on a witness named Mr. Lieb, who was at Maryland Shipbuilding and Dry Dock. Their paths were very short being at the same yard at the same time. Mr. Lieb didn't have any kind of job. He was an expediter or learning to be an expediter, and he didn't know garns. He never mentioned garns. He never put garns on any ship where any asbestos work was being done. So Mr. Lieb does not get over the Lorman test. The other witness is even easier to dispose of, and that's Mr. Zellini. He spent his whole career at Key Highway, and as came up in Mr. Mervis's comments, there's no evidence that Mr. Garns ever was at Key Highway. And when you look at the Social Security printout, when he was at Fairfield, he's got wages attributed to Fairfield. Otherwise, they're just that great unknown Bethlehem Steel as the employer. If there is evidence he worked at Key, do you lose? No, sir. Mr. Zellini has the same fatal flaw that he cannot place, didn't know Mr. Garns, can't place Mr. Garns regularly and frequently in close proximity to any spraying of limpet or any decking work. So he doesn't pass the test. Well, you heard, I think I got that theory from them, which was there was such a massive amount of spraying being done with limpet that anybody on those ships was exposed to it. I think that's what I heard them say. Do you want to respond to that? That can't be true. There were a lot of ships and a lot of employees there. It's quite possible, probable, that unless a witness places him at a place where the spraying is being done regularly and frequently, you better get to an answer quickly on that. Do you have a quick summary answer for that or not? Yes. There's no evidence. There needs to be evidence that he was in the place where the work was done, not that it was a massive shipyard where work was being done, and that's all that happened. Well, they said this. They said he was on those ships. That's what they told me the record reflects. He was on the ships that were being sprayed. That's what they said the record was, and you say? I say they didn't show that he was on the ship where the spraying was being done regularly and frequently and close enough to be exposed. Being generally in the yard on many ships is not enough. If I could have the indulgence of the court for one sentence, the low cilento deposition, it's not needed, it doesn't hurt me, but it's inadmissible and it should be declared inadmissible. Selby Battersby was not a party to that deposition. Selby Battersby had no attorney there and neither it nor any predecessor in interest had any interest in doing it. You don't think we have to declare that inadmissible for you to win the case, do you? You don't, but I sure hope that you take that one extra sentence because it will help a lot of future cases, but it is not necessary. Thank you very much, Your Honor. Thank you, Mr. Locher. Mr. Grenzer. May it please the Court, Louis Grenzer on behalf of MCIC, Inc., in this case. Your Honor, the question was proffered to plaintiff's counsel as to what evidence there was in support of the case against MCIC, and what I heard them say was that there was two pieces of evidence, the deposition of Mr. Garns and the deposition of Mr. Groshon. As MCIC has consistently argued in this case, neither one of those depositions is admissible as to MCIC at either the trial stage, at this case would have gone to trial, or on the summary judgment age. In regards to Mr. Garns, who's really the threshold issue in this case, plaintiffs have never offered any argument in response to MCIC's claim that the deposition is inadmissible. And that deposition is inadmissible because MCIC, as Mr. Locher alluded to, was not present at the deposition of Mr. Garns, and there was no predecessor in interest at the deposition of Mr. Garns. Plaintiffs try to get around this argument by saying it's not a right question, that's only a trial issue, but I think the federal rules and the cases that are sued by the plaintiff, including the Shipley v. Pearlberg case, are clear that- That question can be decided preliminarily. That admissibility can be decided by way of a motion in limine or something before you go to trial. And, Your Honor, we specifically raised that in our motion for summary judgment before the district court, and under the rules, I think that that is appropriate, that what we explained to the court was without that deposition, there is no evidence that Mr. Garns worked anywhere or was exposed to any- Yeah, but the preliminary question is whether or not that is admissible for use. But under summary judgment, it's not just what is admissible, but what can be reduced to admissibility. Correct, and what we explained to the court below was that this deposition cannot be produced in a form at trial that is admissible because it's Mr. Garns' testimony. The plaintiff has offered no document, no other co-worker witness. I don't want you to take any more time on that unless you want to. I'm just saying there's no question that question of admissibility, that evidence may be determined before trial. It can be determined for purposes of summary judgment. There's no question about that. Absolutely, absolutely. And the plaintiffs haven't offered any response to our argument that it isn't admissible, and therefore we think that it should be rendered inadmissible for purposes of summary judgment. And without it, there is no case against the NCIS. No, but just because they didn't render a response, that doesn't make it admissible. You don't win your motion just because they don't oppose it, right? Well, I think the burden shifts to the plaintiff once we have. No, it doesn't. No, it doesn't. On an admissibility? Your Honor, I think that on that issue, once we establish that there's no fact, disability would not be an issue, but there's no fact that they can present in opposition to the motion for summary judgment that will be admissible at trial. And that's the issue we raised with the district court. And because the plaintiff has not, I think once we've made that argument. What are you trying to get us to do for you? Well, I think that there's no evidence in this case. And Your Honor's asked what was the evidence to prove NCIS was at fault here. If that evidence is admissible, you lose. I don't think that we lose anyway, because the evidence against NCIS is simply that he worked around insulators. Mr. Goldman referred to the Balboas case and seems to want to use that as evidence in this case. What's interesting is the Balboas case specifically held that two other companies, Reed Hayden and Armstrong, did all of the insulation work at Fairfield Shipyard. So it seems as though an argument excludes NCIS as being a culpable party in this case. The other points I'd like to make is in regard to Mr. Groshon, his testimony, the plaintiff states that he specifically testified that he worked on the Patrick Henry. That's not supported by the record. And I see I'm out of time, Your Honor. If you have any questions, I'd be more than happy to answer them. Thank you. Thank you, Your Honor. Appreciate it. Mr. Marringer. Good morning, Your Honors. May it please the Court. My name is Donald Marringer, and I'm here representing the General Electric Company this morning. My client's here today because plaintiffs maintain that Judge Russell abused his discretion in denying their motion for relief under Rule 60B, for relief from a summary judgment in favor of GE, this despite the fact that plaintiffs never even filed an opposition to our motion for summary judgment. They failed to do so despite two extensions of the deadline from Judge Russell for them to file that. Judge even said, if you want a further one, you've got to get permission from other parties. They never bothered to even ask us for permission. So when they failed to respond, Judge Russell did a complete review of the record and granted our motion for summary judgment. They filed the motion under 60B, claiming excusable neglect, but the only grounds they offered were really that they were busy with other motions. Judge Russell denied that motion, finding that that does not satisfy excusable neglect, and I fully agree with that. We reviewed that for abuse of discretion? Yes, and that's an abuse of discretion standard, Your Honor. I think if that qualifies as excusable neglect, anything goes. An attorney would merely need to say, listen, I'm very busy. I have a lot of other things on my plate. As this Court, I'm sure, is aware, there are four preliminary factors that a court looks at for even deciding a motion under Rule 60, whether the motion was timely, whether there's any unfair prejudice to the non-moving party, exceptional circumstances, or whether there's some meritorious opposition. Judge Russell really ruled that there was no excusable neglect and no meritorious opposition. I would submit to the Court that there are no exceptional circumstances here either. But let me get to the meritorious defenses. I don't think we even need to get there because I don't think there's excusable neglect. But there's no meritorious defense to GE's motion for summary judgment. First of all, there's no testimonial evidence whatsoever connecting Mr. Garns with any General Electric product, whether it contains asbestos or not. It's not in Mr. Garns' testimony. It's not in Mr. Groshon and Mr. Durer's deposition testimony. And I'm not really going to get into admissibility, go down that rabbit horn, but GE wasn't a party to any of the cases in which those depositions were taken. But enough said on that. There was no mention of GE or GE turbines. One of the problems here is that plaintiffs don't seem to understand what the GE product is. At four times in their brief, four times, they say that GE manufactured boilers. That's at page 4, page 18, and twice on page 20. It's not in the record that GE manufactured boilers, and it's not in reality. GE never manufactured boilers. GE's interrogatory answers, which are at JA 2025 through 2026, make the following points. GE made marine turbines to propel ships. This is the product for which GE is generally sued, and it's sued in shipyard cases. Marine turbines are something that were not used on Liberty ships, and that's also, by the way, in our answers to interrogatories. So is your argument, we don't mind getting sued, but at least sue us for the right thing? Yeah, we'd kind of like to know what we're shooting at. Yeah, what they're shooting at. What they're shooting at, so we know when to duck, I guess, is the way I should phrase it. There were no GE turbines on Liberty ships. Just to say, as a historical interest, turbines were a technology that were developed at the end of World War II. Liberty ships were at the very beginning. They weren't around at the time. Is that what you're saying? That's correct. I mean, they did, by the end of World War II, come in. And that's actually in our answers to interrogatories. In footnote three in our brief, I mentioned that. But it actually is in our interrogatory answers. So we think, under any view of this record, there's absolutely no evidence that any GE product was near Mr. Barnes. And with that, I'll just leave it, and thank you very much for your time. Thank you, sir. Appreciate it. Mr. Goldman, Mr. Skeen, you all have some time reserved. The defendant appellants have not answered our contention that the findings of the Court of Appeals of Maryland in Balboas, as to what went on in Fairfield, are sufficient to incriminate defendants. No frequency was shown. Balboas never, no one testified that Balboas was frequently around a product, close to a product, named, etc. Judge Radowski went on the Holmes maxim, The life of the law is not logic, it has been an experience. And my brethren have not again said that. They haven't again said that. MCIC, my brethren have not contradicted or talked about it. The same is true when Garnes knocked the asbestos off the pipes of the Patrick Henry when it was scrap. Mr. Granger says nothing about that. The question, there's no question, if you look at Cheddarly, and you look at Garrett and Godwin, that very, I'm sure your honors would, if you tried the case, would say, quote, thin, close quote evidence. But Garrett and Godwin admitted thin, quote, thin evidence. And I submit for a simple reason. The man walks into a shipyard with a perfectly good pair of lungs. He is exposed to general asbestos, and he ends up with an asbestos-related disease, and he didn't get it from heaven. He got it from exposure to a number of products. And that's the underlying finding of Judge Radowski in Balboas, which they can't escape. If it wasn't there, we wouldn't rely on it. But if it's there, we have a right to try to persuade your honors that that is a ground for finding liability in this case. When it comes to GE, I repeated in my brief over and over and over again that GE, in its notice of removal, said it had product on, at Fairfield, where Garns worked. And we asked them in an interrogatory, and all we got was that GE answered, we don't have anything at Fairfield for the Patrick Henry. What about the other 16 ships? And it doesn't have to be turbines, and it doesn't have to be boilers. Garns testified they were pumps on those Fairfield ships. And I strenuously brought this to the district judge under Custer, and I said, you have to make an independent examination, and you can't grant summary judgment when GE is hiding evidence and not answering interrogatories and admitting in his removal and admitting in their removal that they had product on the ships so that they would be subject to the orders of a federal officer. It's not a vacuum. I have one, I point out again, Judge Moynihan never mentioned Vorman. He reversed Judge Harvey because Judge Harvey employed Vorman mistakenly, and he expanded the proof with Garrett and Godwin and Balboas. The frequent regularity and proximity of Balboas is a far cry from Vorman. I just want to say one other thing about the substantial factor causation because it's tricky, but Judge Rodowsky really went to school on it. He read the restatement, he read Prosser, and Judge Chastanet read Armstrong and said it needs no further explanation or elucidation. It's a phrase sufficiently understandable for the layman, and that's in my repeated citations of Armstrong. You don't have to charge a jury, frequency, regularity, and proximity because of the restatement, because of Prosser, and because of Armstrong. I have, and I don't have much time, do I? Your clock will indicate right there. Keep going, keep right on going for a while. Judge Rodowsky really went to school on this issue of substantial factor causation, and there are a couple of quotes, I may not be able to read them all, but I wish that the court would look in Balboas at page 459. Can you read that, Bob? 459, footnote 11, page 439, and 463. Can I tell you what I told the jury in Balboas? Even if it's not in the record? This is what happened. I said to these jurors, five tanneries put their tannic acid in the stream, upstream from Farmer Brown's cow. Farmer Brown's cow dies. Who did it? What's a substantial factor? They all did. You can't logic chop that I didn't dump a big amount of tannic acid, because you don't know, every torch phaser doesn't know, in the light of everything else this man has got in his lungs, when it goes over the line and he ends up with an asbestos-related disease. That's the beauty of substantial factor. And Judge Harvey said to me, Mr. Goldman, have you noticed that the more defendants have product in a given situation, the less likely any of them are to be a substantial factor. He was looking through the wrong end of the telescope. They all were, just like the farmer who killed Farmer Brown's cow. Thank you for allowing me to. Thank you, Mr. Goldman. McKean? Yes, Your Honors. I just have one further matter, as far as evidence goes, that has to be decked and I didn't have a chance to raise. Mr. Garns worked there from 1944 to 1947, and he worked there as a burner. He no longer was a general laborer, he was sleeping up after other workers had completed their work. And he also testified, unfortunately I do not have the joint appendix in front of me, he also worked there on liberty ships. Mr. Leib, who was mentioned by Mr. Locher, was a production expediter trainer at Maryland Dry Lock from 1947 to 1949. As a production trainee, he was required to go on board ships to monitor the work that was being done by outside contractors. Mr. Leib testified that spraying was done on all the major conversions during the 1947 to 1949 time frame. Also, Mr. Salento, ironically, ended up at Maryland Dry Dock, too, from 1942 to 1945. And while at Maryland Dry Dock, Mr. Lo Salento testified that he was spraying asbestos insulation. While Mr. Lo Salento was working at Maryland Dry Dock, he testified that he worked around welders on a daily basis. As Mr. Garns was a burner, you certainly could draw the assumption that he came into contact with welders as well as burners. One more word. We cited Chipley Pearlberg with Judge Niemeyer, Wigmore. You don't need admissibility to oppose a motion for summary judgment. I can't see how the defendants would keep swinging that. It's settled. It's interesting that Groschan's deposition will be admissible at trial because MCIC was the distributor for carry cell attacks. So that means that MCIC is hooked. That's what Groschan thought by the fact that MCIC was the agent for cell attacks. Thank you. Thank you, Mr. Goldman. Thank you, Mr. Skeen.
judges: Robert B. King, Dennis W. Shedd, Stephanie D. Thacker